Good morning, Your Honors. May I please record Philip Mussolino for the plaintiffs below appellants here. I've addressed, I believe, in my reply brief the issue, the arguments that were raised in the appellee's brief. And let me see if I can focus a bit on, I think, the important pieces of the chronology here as they relate to the bank's action with respect to our two clients, the first being that the record is clear and there might have been some controversy. I think the record is clear that the bank itself was designated not by my clients but by the colony slash capital parties. There is nothing in the record that indicates that my clients had any contact at all with the bank prior to that. By contrast, of course, the thing we have to be concerned about, I think, Mr. Mussolino, is whether the bank undertook any obligations of a special nature to your client. You've alleged a breach of contract action, for example, said they breached a contract. What was their contractual obligation and how did it arise? We allege, in addition to our fiduciary duty and negligence claims. I'm sorry, I didn't hear you. In addition to our fiduciary duty and negligence claims, Your Honor, our contract We'll get to those in a minute. I'm talking about the breach of contract. Our contract claims arise out of three events, all of which flow not from the making of the contracts with colony and capital but arise out of, for all practical purposes, the meetings that each of our clients had with the colony representatives at the bank with representatives of the bank. And as we allege very explicitly in our complaint and as we address in depth in our motion below and in our brief, the meeting included a specific commitment made by the bank to ensure that the escrowed funds would be maintained in accounts under the control of each plaintiff. Both plaintiffs testified specifically to separate meetings, testified specifically that in the course of those meetings were present representatives from colony, representatives from the bank, and the particular investor who was involved in the transaction, that both the profit-sharing agreement, if you will, and the escrow agreement were discussed at length and the banks were familiar with it. All of this is alleged in the complaint. And that specifically the complaint alleges that the bank agreed that the monies that were to be deposited in the escrow account would be deposited into an account that was controlled by the investor. That's the allegation in the complaint. Well, did the investor, and we'll treat them both the same with all the plaintiffs here, did they deposit their money into an escrow account? They deposited their money initially into what, to use the appellee's phrase, an ordinary checking account as the escrow agreement with colony provided. And it was out of that ordinary checking account that the monies were transferred into the account from whence the monies disappeared. Well, who could draw the money out of the ordinary checking account? The only persons who could draw the money out of the ordinary checking account were the investors. Was the investor? Were each of the investors in their own checking accounts. And then did they then draw the money out and put it into an escrow account? One investor wrote it. One investor, Angeloff, wrote a check out of that account for $1 million with specific instructions to the bank. Two instructions. The instructions, which are part of the record in alleging the complaint, provided that these monies are to be applied to the colony escrow account. And then it said with further credit to my escrow account with an account number and a prefix EA. So the instruction out of the checking account specifically provided for a deposit into a sub-escrow account, if you will, in the name of the investor, as was contemplated by both the escrow agreement with colony and the profit sharing agreement. In the case of Angeloff, the check itself that accompanied this instruction said in the notes section, for credit to my escrow account. Okay. With respect to the ‑‑ Well, now, you see, when we get over to the negligence action, you make a pretty strong argument that a duty was created on the part of the bank by these various acts, and then your allegations are of a breach of that duty. And, you know, I think you can maybe ‑‑ it might be possible to read into there some sort of a claim for negligence. But for the breach of contract, it's a little unclear to me just exactly what the bank was doing. The bank was just saying, well, you know, we'll let you open an account here. And they opened the account, and that's about it. But that's where I disagree, Your Honor. What the complaint specifically alleges is, and as I said, this is on a motion to dismiss, so there's no discovery, no motion for summary judgment, no contesting of the facts, naturally, by the defendant below. The complaint specifically alleges that an agreement was reached, first, that the bank would comply with the provisions that are set out as they relate to the depository bank. That's the phrase that was used in the colony in capital agreements. But secondly and separately, the bank agreed at that meeting, in each instance, to ensure that the escrow accounts were maintained under the control of the investor. That's not in writing anywhere. That's just someone's recollection of what was said at a meeting. That is correct, Your Honor, although it is two separate plaintiffs, each in separate meetings, one of whom was an attorney who was a representative of Mr. Angeloff, and the second was the president of Kids Fight Cancer, who was also accompanied by his attorney. So it's true that it's an allegation of an oral agreement. But I would then submit that, of course, the instructions that came with the payments out of the checking accounts were very clear that the monies were to be deposited into, quote, my escrow account or, in one instance, to an escrow account with further credit to the bank. But there are, I take it, there are depository agreements that one has to sign to have an account at the bank, correct? There's a written agreement that's created. I don't dispute that at all. And so you're saying that there were oral representations made that modified or expanded the duties that the bank had under those agreements? Yeah. We characterize it either as a clarification, a modification, an expansion, or something. And I think, as we argued in our brief, it really makes no difference which one it was. If you try and figure out exactly, precisely what the language of, say, you could look at the colony agreement and turn it inside out. Some of the language is unique, I suppose you could say. But it did, the colony agreement did specifically provide that the investment monies would move out of the checking account controlled by the investor into an escrow account, quote, in the investor's name. So our position is that the language in the agreements themselves that the bank agreed to abide by very clearly mandates that the monies be moved out of the checking account into an escrow account in the name of the investor. There's no indication, we haven't had discovery, but we certainly allege that no escrow account was created, and certainly the monies weren't moved into an escrow account in the name of the investors. Our assumption that we haven't had discovery is, we allege it here, we assume it, is that it was just given to the colony and capital people into their operating account. So the one thing that seems to me as very clear is the agreements themselves, which we allege were the subject of the conversation with the bank when everybody met at the bank's offices, provided that the escrow account was to be in the investor's name. There's no challenge to that. Now, what that means in practice, Your Honor, with respect to the documentation themselves and the bank's standards and obligations, we don't, those are the details that I would submit or the details that would normally come out in discovery and might be subject to discussion. Well, that gets into another question I had, which is, after the district court dismissed the case, apparently you didn't seek leave to amend. Is that correct? No, we addressed that, Your Honor, in our brief. And the problem is that there were a number of, I don't want to say scattershot, but a number of different allegations made by the defendant about defects in the complaints. If we don't get guidance from the court when it issues its motion to dismiss, we don't know what it is we should move to amend. So we had included, for instance, in our brief, where there was a challenge to the language that we used for purposes of the standard of care applicable to a bank, that we would be perfectly happy to amend to use their language instead of ours, although we didn't think it was necessary. Well, I understand that you sought leave to amend in opposing the motion to dismiss. But after it was granted, if I'm understanding the record correctly, there was no subsequent effort made to try to amend the complaint you just appealed. Correct, Your Honor. And as I say, if we had received a decision from the court where it specified the basis for its ruling, we would have at least been able to pinpoint whether or not we could in good faith amend to satisfy what the court found as a defect. And we could have, I suppose, moved to amend to address every single conceivable pleadings deficiency. Or sought clarification. I'm wondering, and this is an issue of appellate jurisdiction, since you were not specifically denied leave to amend and you didn't seek it, which is where you are procedurally. Well, our view is in the absence of any guidance from the court. We have the perfect right to appeal on the theory that the court adopted. Some are all of the defendant's views below. And to the extent that they've been argued here, we assume that the defendants have selected out the arguments they thought were most persuasive and we believe we've addressed them all. And we also believe some of them have been weighed by not being asserted up here. But if we were going to amend, since I think, and I may be presuming too much, but the thrust of the defendant's argument isn't you used the wrong phrase or the wrong language. It is there is a phrase in one of the agreements that trumps the various other oral agreements. I don't think that was a pleadings adjustment. We laid out those agreements ourselves in the complaint, so I don't think there was an amendment to be made if that's the principal issue. I just don't. But what was the purpose of all these machinations that you all went through? Well, from the point of view of our clients, Your Honor, our clients were investors who were under the impression that they were getting into a fairly safe investment that was going to be protected by the involvement, and this is the aura of respectability issue we raised, that was going to be protected by the language creating and requiring the escrow agreements and that had a certain amount of reliability, this is one of our accounts, because we were taken over to meet the bank and we discussed the documents themselves with the officers of the bank. So from our client's point of view, they were protected by the language in the agreements requiring the payments into the escrow account, that's in the written agreements. They were protected by, in the case of Kids Fight Cancer, a specific instruction, a specific provision that required signatory authority from Mr. Pelosi and counsel for Kids Fight Cancer before there can be any distributions, an issue which was never discussed below by the court, never discussed in the briefs. And they were protected by the specific instructions that accompanied their What were your clients expecting to get out of it? Well, under the terms of the agreement, Your Honor, under the terms of the profit-sharing agreement, there were projected returns based on this theory of prime bank instruments, and the projected returns were 50 percent returns to be split with colony or capital. And the theory behind the investment, which the SEC has characterized as a bogus or fraudulent scheme, the theory behind it is that there are these prime bank instruments, sort of the secret world of banks where all the rich people make profits and everybody else is on the outside looking in. And the theory is we're going to have a pool of $20 million, as was set out in the agreements. And because we have this pool of money, we'll be able to interject ourselves into these high-profit, bank-to-bank overnight transactions. That's sort of the underlying theory, which the SEC and the Federal Reserve, as we point out in our complaint, has characterized as bogus or no such thing as prime bank instruments. But the theory that attracts the investors, and our clients weren't the only investors, but the theory that attracts them is that you're now going to be on the inside of these bank transactions making profits, and your money is safe because these agreements were all talked about being non-dissipating accounts, was because for every purchase of one of these instruments, there would be a contemporaneous sale. An exit buyer, as they say in the agreements, would be available contemporaneously, and there would never be a purchase without a sale, so that you never, ever actually had to use the monies that were deposited into these accounts. There would be a $20 million pool that presumably would give Colony and Capital entry into this area of high finance, but they would make their money off the spread between the buy piece of the transaction and the matching sale. So how did your clients get involved in this? How'd they meet all these people? How'd they get together? How did a charity in Chicago and an investor in Bulgaria get involved? I don't know the particulars of who the salespeople were for these transactions, Your Honor, hasn't come out yet, but I assume they were solicited by a gentleman by the name of Robert Tringham or a gentleman by the name of Okopian, who were people experienced in international finance who were traveling around the country and around the world trying to find investors. And their sales pitch was that you cannot be a small investor, you have to invest $1 million, you have to invest $5 million, and that's the entry fee into these kinds of investments. So I don't know the particulars of who called whom when. I'm sure one of the players, one of the participants in Colony was in his marketing efforts the one who tracked down Mr. Angeloff and the one who tracked down Kids Fight Cancer. Well, how did your clients raise the money? Mr. Angeloff is an investor in Eastern Europe and here in the United States, so he had $1 million. He, in fact, invested a second million dollars, which I suspect, though I don't know, is what funded some of the payouts off the first round. And Kids Fight Cancer is a very successful charity in Chicago that had money to invest and invested with the advice of its counsel, who attended, as I said, this meeting at the bank and received assurances from the bank's participation, as well as the comfort that came from the language in the escrow agreement provided for these escrow accounts. So the lawyer was in the middle of this? As is usually the case, the lawyer was at least present and giving his advice and making his recommendations with respect to Kids Fight Cancer and attended the meeting at the bank. And what due diligence did he engage in? I don't know the details of his due diligence except to say that I believe his view was that the language in the agreement itself in the first place that provided for payments into an escrow account in the name of the investor provided him with sufficient protection. He then added the requisite signature authority of Mr. Pelosi, who is the chairman or the president of the charity, as well as the lawyer's signature, so he had that. He then had the face-to-face meeting with the bank where they, as our complaint alleges, assured him that any monies that were transferred out of the checking account would be transferred into an escrow account under the control of the investor, not the bank and not Capital and not Colony. And he then issued instructions to the bank, and these instructions did not go to Colony. They went directly to the bank saying, take this money out of my checking account and place this money into my escrow account, not an escrow account but my escrow account. So from the lawyer's point of view, I would submit he took a number of steps and had a number of things to look at that would give him comfort that the monies itself, the principal, would never actually be dispersed out of the control of Kids Fight Cancer, and I think that was a reasonable position. The problem was that the bank, setting aside any effort to construe the Colony and Capital, setting aside any of those discussions, and I would submit that on a motion to dismiss, trying to make a legal determination about the meaning of these ambiguous phrases is premature. Was there anything that the court considered that was outside the pleadings? The court had attached to the complaint were the six agreements. For instance, there was a copy of a check that was the check from Exhibit No. 1. I think it's on 19 of the excerpts. The check that says credit to be applied to my escrow account with the escrow account number. So on that issue, I'd say it was the six agreements and that check, and there were additional exhibits with respect to the vicarious liability of the holding company that showed the connection between the holding company and the bank. But I'd say principally, Your Honor, it would be the six. Shouldn't this have been treated as a motion for summary judgment? Yes, Your Honor. There should have been a notice that there was an intent to treat it as a summary judgment with the appropriate opportunity for the parties to submit an affidavit that they needed discovery to respond, but it certainly should not. There was no notice, and, of course, notice would be required to treat it as a motion for summary judgment to give the parties an opportunity to respond. Had that happened, we probably would have gotten some clarity, which we do not have yet, from the bank about what it did and why it did what it did. Was there an objection made on behalf of your client? No, Your Honor. This matter shouldn't be heard just on the pleadings. There was extraneous evidence that was before the court and that it should have been treated as a motion for summary judgment. We didn't quarrel with the use of extraneous evidence, though. We did argue, Your Honor, that the test to be applied on the 12B … Wouldn't that have taken care of some of your problems? You'd have had discovery and … Yes, Your Honor. In fact, the first judge in the Southern District before he retired had suggested to the defendants that this matter should be – the motion should be withdrawn, discovery should convince, and the matter would be more appropriately resolved on summary judgment or trial, which was our argument below. Our view is that we certainly pleaded under all the pleading standards, everything that was necessary to assert claims along these lines. Well, the luck of the draw wasn't with you in Los Angeles. That sometimes happens, Your Honor. I will accept that. I think that's probably true. But that doesn't change the fact that the 12B6 standard here couldn't have been satisfied under the facts that were alleged in the complaint and on the exhibits that were attached and incorporated. If nothing else, there is no resolution by the court of the simple question about whether a bank can simply ignore the instructions of its own client without being involved in negligence. I'd ask when the instruction comes in from an investor saying deposit this into my escrow account, even if the bank goes back and looks at the documents and says, gee, I'm not sure we have to do that, the last thing a bank fulfilling its obligation to its depositor can do is simply ignore the depositor's instructions, go on and move the money out to somebody else's account, and then remain silent about it. So my view is on the very basic areas of negligence law and breach of fiduciary duty, Your Honor, in the absence of discovery and some explanation for the bank. But the money went into the escrow account, didn't it? The money did not go in, never went into an escrow account, Your Honor. If it had gone into an escrow account that was controlled by our client or arguably controlled by our client or arguably complied with the documents, we wouldn't be here. So the money went from the checking account out. Out. Out is the best way to... Let me ask you a couple of quick questions. Has a suit been filed against Colony Mortgage? Yes. Colony ended up in bankruptcy. And I believe an adversary proceeding has been filed in that case, but they're in bankruptcy pleading poverty. Capital, the other defendant, has disappeared. Did the plaintiffs know each other before they made their investments? No. They did not. These plaintiffs and several other investors, I believe there were $9 million worth of investors, that's an approximate number, in this particular round, were all unfamiliar to each other, all subjected to the same bogus investment opportunity. And I believe they're all creditors in bankruptcy. Let me ask you this. Regarding the claim of breach of fiduciary duty, just looking at the complaint, how do we know what kind of an account Angelov deposited his money in, whether it was checking, savings? I believe the agreement provides that it was to be in a checking account Just looking at the pleadings. Okay, Your Honor. That's what I asked. Just looking at the pleadings. We allege, I believe we don't allege the exact nature of the account, although the check, out of which Mr. Angelov's $1 million came from, is attached as an exhibit in opposition to the motion, and I believe it shows, I presume it shows itself to be just a checking account. I'll check to see if we specify the exact nature of the account, Your Honor, but I don't think anyone disagrees that the initial million dollars that created the, if you will, the bank depository, the bank-customer relationship, was a checking account, although I believe the Kids Fight Cancer transfer may have been by a wire transfer instead of a check. I believe they were both checking accounts. But the one thing that's clear, Your Honor, is the initial accounts, of course, were under the complete control of the investors, as the investors assumed would be the case with the escrow accounts. Sir, again? I said the initial accounts where the million dollars came into Wilshire for the first stage,  as the investors assumed would also be the case with the escrow accounts into which the monies were moved. See, I think, and this is not in the record, so I can only speculate, but there is a reference in the escrow agreements, I believe, or the profit sharing agreement, to creating a pool of $20 million that would effectively create a sort of ability to assert the availability of significant funds. So I suspect the evidence would show that the sales pitch and the argument was, we need to show that we have escrow amounts of $20 million with investors so that we can play in the prime bank instrument world. And that's all in the complaint. Now, that last piece, Your Honor, is really just my inference, although what is in the complaint is the prime bank instrument sales pitch, because that's in the agreements, and the talk about a pool of $20 million, and the discussion about what the mechanism was going to be for making the money. And so you can read the approach. That would be another reason to treat this matter as a motion for summary judgment. Except, of course, that had the judge sent us a notice that he intended to treat this matter as a motion for summary judgment, we would have had the opportunity to assert at least the right to discovery in the event that there are gaps in the facts that we thought were relevant to these issues. And we certainly would have done that. We certainly would have at least gone to the bank and said no, Your Honor, and I have to say we've made requests before this suit was filed for an explanation from Wilshire, and since I wrote them, I can represent the court, the only response I ever got from Wilshire's counsel was, at one point the lawyer told me he was on vacation and he'd get back to me, and we never got any explanation, any documents, anything from Wilshire. And there's nothing in the record, because Wilshire decided to proceed under 12b-6 and not 56, thereby cutting off the sort of discovery that would otherwise be available. Now, they then live with the 12b-6 standard, which is why I say, you know, we can live with the 12b-6 standard, too, because we believe we satisfied the pleadings requirements. How the facts play out, I don't know what Wilshire would say in discovery if we were heading toward Rule 56, but it certainly would have been the way to flesh out the relevant facts instead of trying to figure out what may or may not have happened at the meeting or what may or may not have happened after the meeting. At some point, missing from the chronology, is what led the bank to make the simplest of erroneous decisions. When the bank gets a check for a million dollars from its customer with instructions to do something that specifically includes its deposit into an escrow account with an escrow account number, the, in this case, $3 million question is, how does a bank meet its, let's take the simplest argument, take the negligence argument, set aside the, how does the bank meet its duty to its customer by simply ignoring the customer's instructions and moving the money into an account, to use your Honor's word, where the money went out? In the simplest of cases, the defending concedes that at least with respect to following the customer's instructions, the bank has a duty to do so. Set aside all the other issues, and in fact, the defendants acknowledge that that was a fiduciary duty, not just a duty flowing out of some negligence standard. So if we take the case at its very simplest and say whatever all these documents mean, here are the instructions, where is the escrow account? And to respond to Your Honor's earlier question, a protection that the lawyer from Kids Fight Cancer had relied on, where is the fact that explains why the bank didn't either do what the instructions said to do or decline to do it and say, well, I don't think we have the authority to do it. As we allege in our complaint, the bank never said that it was going to ignore the instructions and never, in fact, disclosed that it was ignoring the instructions. So at the simplest of negligence tests, the bank is going to bear the burden, it seems to me, for having failed to do something as simple as picking up the phone and calling the investor or writing a letter back to the investor that says, I have your instructions, we can't comply with them. All right. How much time? You're way over. I'm a bit over. You're overdrawn. Sorry. Thank you very much, Your Honor. Good morning, and may it please the Court. My name is Eric Olson. I'm appearing on behalf of the responding parties, Wilshire Bank Corp, Inc., and Wilshire State Bank. I'd like to address some of the key questions. In particular, a key question asked by Judge Thompson at the inception of the hearing, which is did the bank, Wilshire State Bank, did the bank undertake any special obligations with respect to these particular investors? The answer is absolutely not. The clear facts as shown in the allegations of the complaint and the exhibits that are attached there, too, which are the agreements, the joint venture and escrow agreements between the investors and colony on the one hand and capital on the other hand, those agreements are incorporated into the complaint by reference. Those agreements do not impose any special duties or obligations on the bank whatsoever, and there are no special fiduciary duties that have been imposed by either a course of conduct or by any agreement, oral or express. I think to take a step back, it's helpful to actually look at the chronology of these agreements. And I think that yes. Let me just ask you this question. Excuse me for interrupting you. Before the judge, were there matters that were outside of the pleadings so that this should have been treated as a motion for summary judgment? The only matters that were outside the pleadings that were presented were matters that were presented by the plaintiffs in opposition to a pleading motion that had been brought by the defendants in the case, who are the respondents in this action. The respondents did not introduce any extrinsic evidence, and there's no evidence in the record that the judge actually considered those extraneous matters in ruling upon the 12B6 motion that was before the court down below. So I don't believe that it was appropriate. Were there any objections made on behalf of your clients that the opposing counsel was introducing matters outside of the pleading, the complaint? I don't know that there was any objection made at the time. I do know that none of the parties requested that the court treat the motion as a summary judgment. And the parties all proceeded as a 12B6 motion. And the court made no comments with reference to evidentiary matters that were not stated in the pleadings and the complaint? That is correct. The court did not comment on it one way or the other, Your Honor. What do you think of the argument that counsel made about statements being made by bank representatives that were in addition to the ordinary deposit agreements? In other words, they allegedly said that the money would be placed in an account that was under the control of the depositors. The deposit agreements say what they say. The accounts are what they are. But they're saying that the something extra that would get you into a breach of contract or a breach of fiduciary duties comes from, in part, statements made by bank representatives. On 12B6 motion, why isn't that enough to get beyond where you are? Again, Your Honor, this is where the chronology is important. If you look at the complaint, there's only a meeting alleged with respect to the first two of the three agreements that are really at issue. And these were agreements signed in May of 2007 between Plaintiff Angeloff and Colony on the one hand and Plaintiff Charity Kids with Colony on the other hand. Then there was an investment meeting in June of 2007. The plaintiffs alleged that there were these meetings that took place. At some point, it's unclear from the complaint, but at some point after when the joint venture agreements were agreed to between the plaintiffs and Colony and when the investment was made in June of 2007, somewhere in there this purported meeting took place. Each of these agreements contains both an integration clause as well as a modification clause that requires any modifications to be made in writing. There's no evidence of any writing modifying. And, in fact, Appellant's counsel today has indicated that these meetings qualified as some kind of a clarification or a modification or an expansion. Well, to the extent that the bank is being brought in to the duties imposed by these joint venture agreements, it seems that those claims will be barred by the application. Well, I think that's right. I don't think it can be part of the original contract. But what about the claim that there's, in a sense, a separate oral contract? And counsel didn't say this. This is just what I'm trying to think through theoretically. The agreements are signed. Everything's done. There's the investor meeting. The investors want some reassurance, and they say, you know, can you assure me that I'm going to have control over my money? And then somebody from the bank says, yes, here's what we're going to do. Now, why is that why could that under a 12B6 standard not be viewed as a separate oral contract? Well, because you also need to take into effect the third contract, which was then entered into in July of 2007. And after these meetings. And after these meetings. That's correct. And there was no, and again, this is an integrated contract. It says there's no other agreements outside of this. There's a written modification requirement. If any of this contract were to be modified, it must be in writing. And this is subsequent to the time that these alleged meetings took place and these purported representations took place. And there's no meeting alleged with respect to the July agreement, the July 2007 agreement. And this is all in the record by means of documents that plaintiffs incorporated by reference. That is correct. These are the exhibits to the complaint. Just looking at the dates on the agreements themselves, as well as the allegations concerning an oral agreement. Now, the agreements, each of those three agreements, the two May 2007 agreements and the July 2007 agreement, are clear that the account is supposed to be a trust account. The colony or the, or capital, the two companies were the trustee that was given the charge to, or actually under the agreement, they would be exclusively managing those accounts, the substance of it. So now we get into the question of did the bank actually follow the instructions that were given by its depositors. As counsel indicated, this was done by a simple check. Payable to colony mortgage bank. That this was the direction that the bank got. It said my account, but then it specified where to send it to. It said this money goes to colony. And later, this money goes to capital. That's where the money went. The qualification saying that this should have been a sub escrow account implicitly requiring some activity by the bank in terms of setting up a sub escrow account, that's not present in the agreements. It's not reflected in the, certainly not reflected in the complaint, or with respect to the agreements that are there between the bank. There's no agreement between the bank and the plaintiffs, or between the investing company, colony or capital on the one hand, and the plaintiffs on the other hand. That this is simply outside of that, but that the bank transferred the money to the place that it was intended. The money was sent to colony. The money was sent to capital. From that point on, whether that money was deposited into a sub escrow account or treated in any which way, that was not the bank's responsibility. That was the duty of colony or capital under their agreements with the plaintiffs. It was their responsibility to manage those funds. It was their responsibility to manage those accounts, as the plaintiffs agreed that that would be the case. But here, what the plaintiffs have tried to do is foist that liability upon the bank for simply being a depository bank. It was not involved substantively in these investments. It did not create this aura of authenticity that is discussed in the briefs with respect to aiding and abetting fiduciary duty violations, potentially by the trustees. There was no salesmanship done by the bank employees. There was no allegation of any involvement in representing or discussing the qualifications of colony or capital. Were there similar deposits made by others? I'm not aware of any other deposits, Your Honor. Are you with respect to other investors in colony or capital? Yeah. There's certainly no record of that before the Court at this time, and I'm not aware of other investors. Whether there could have been, whether there are or there weren't, I can't say at this time, Your Honor. Well, why did these people go to your bank to begin with? The bank was selected as per the agreement, provided that the colony or capital could select the depositing bank into which the investors would put their initial funds. And that was simply designated at some point as Wilshire State Bank. And so the bank was selected. Well, I mean, here you've got somebody from Bulgaria, I think, and someone from Chicago. So how did they both end up in the same bank? Well, the bank was selected by the investing company, by colony or by capital. Whether they had other accounts with Wilshire State Bank, that's not in the record before the Court at this time. And the reason why Wilshire State Bank is not in the record, and it's not clear from the pleadings why that's the case. But at the end of the day, the central question is, did the bank assume any extra duties, even if we accept as true that there was some meeting that took place with unnamed bank representatives at some bank location in the time frame of May or June 2007? Is that enough? Well, how are we ever going to know all this unless there's discovery? Well, if it gets into that, then perhaps discovery would clarify these things. But we look at the pleadings themselves and the exhibits that are attached, and the duties are clear. There is no duty on the bank. It's merely a depository bank that plaintiffs are suing the bank for violation of the joint venture and escrow agreements. That's expressly in the complaint, that they are somehow attributing liability under those agreements to which the bank is not a signatory. Do you represent the bank? That's correct, Your Honor. And you don't know whether there are other deals like this that went through the bank? I do not know, Your Honor. Are you curious? Am I curious? Yeah. I don't know that I am. I don't know that it matters for the purposes that we're here today, Your Honor. Well, you see, this fellow deposits at one of these Angelo's. And in the first account, there's no problem. I mean, the bank is the debtor, I guess, and the depositor is the creditor under a normal bank deposit arrangement. No problem with that at all. Then he comes along and he draws a check payable to Colony and maybe another check payable to the other one, to Capital. And he says he gives that money to the bank with instructions to the bank to deposit it to his trust account. Now, this sort of brings to one's mind that, you know, what does he mean, his trust account? He can't be a total dope. He's got a million bucks in him. I mean, it sort of brings to mind that, well, maybe they did sort of agree that this bank would see that his money went into some trust relationship or escrow relationship and that the bank and he agreed that there'd be some obligation to the bank if he were to deposit this money in this fashion and that the bank then failed to exercise reasonable care in carrying out those instructions. You can kind of maybe get that from the complaint. Maybe you have to read other stuff into the complaint, but that's kind of the flavor you get. Now, what did he say? Did he send his check with a letter to the bank? And he said deposit this to my trust account. Where did that come from? Well, with respect to the transfer to Colony, there's an indication that it says, the plaintiff said, transfer to my account. And it's not clear on the record, frankly, how that instruction was conveyed. There is a check, and that is attached. It's put in the record. It's one of the documents that had been attached by the plaintiffs in opposition to the motion to dismiss. Unfortunately, the record's a bit difficult to read, but it does show that the check is payable to Colony Mortgage Bank Corp. There's a memo line on there that says, for further credit to my escrow account or something to that effect. And so what you have is sort of a general – the description of transfer to my account is kind of a general statement, but then the specific is, send it to the account in the name of Colony Mortgage Bank Corp. or to Capital Bank. That's the specific instruction that the bank received. Then the memo line – I don't know what you can do with a memo line with respect to management of those funds once it's transferred to the intended recipient, which we believe did, in fact, have a trust account that the money went into, that they were the trustee of and have responsibility for managing in accordance with their agreements. But once the bank simply moved the money to the intended recipient, its duties were done. It had fulfilled its duties. Well, why would its duties be done? Because it's confusing with that little memo line. Well, I don't know that – We'll write a check, say to a charity, and just say to be used for breakfast cereal. Let's see that. And they're not sure. Is that just expressing a general desire or is that a limitation on the use of the funds? And so you think a reasonable bank would call up and say to the person who wrote the check, well, what do you mean by this? I think Your Honor's question would be directly applicable. I've never met a banker yet that wasn't very careful about the way they treat depositors' money. Your Honor, I believe the question would have more direct applicability to the facts of this case. In this case, if the bank were – In my bank, I almost endorse it three different ways. I put my fingerprint. I'm joking about that. I understand, Your Honor. Yeah. In this case, the bank was not the designated manager of those funds. That's a notation for the manager of the funds calling their capital who were the intended recipients. So in the example that Your Honor used of a check to a charity saying that this money should be used for this particular purpose, that is an instruction to the recipient of the funds, not to the bank through which those funds pass. And that's really the situation that we're in here. The bank was simply the depository bank through which these funds transferred. They were not the designated manager of those funds and had no responsibility under any of the agreements to manage those funds. That was the responsibility of Colony or Capital. And any issue that the plaintiffs have with Colony and Capital can be dealt with in their various other litigations. Why did all these people sit down with the bank before they culminated this deal and get information from the bank? Why'd they have to go through all that? There's no evidence in the allegations of the complaint that the bank was providing them with information about the deal. All that they say is that there was a meeting that took place at a bank branch and it's not specified exactly where. And so it could have just simply been a convenient place for the investors and the investing company to meet, a location for them to get together. It's not clear as to the why. But it is clear, though, when you look at the totality. Was there a bank manager in the room? That's not clear. The plaintiffs do not allege who was there. If somebody comes in with a million dollars, the bank manager's going to at least bring you a cup of coffee. You know, you might pay your parking or something. Pay your parking. They may have validated parking. That's true. But I don't know from the pleadings who was there. There certainly is no allegation as to the authority of the person who supposedly attended the meeting, how long that they were there at the meeting, what the circumstances were. The allegations are really quite vague. You know, all you need is just a brief statement setting forth a claim for relief. Again, to go back to our original point, though, when you look at the actual agreements that were signed and which the plaintiffs are seeking to impose liability on the bank for violation of, these are the joint venture and escrow agreements that are attached to the complaint. There is no mention of any duty upon the bank to manage the funds. There's no special obligations imposed upon the depository bank. And the fact that there was a third agreement, again, reiterating the duties between the plaintiffs and the investing company that was entered into after these supposed oral agreements with the bank where the bank somehow subjected itself to the obligations of the prior two agreements, that it's just simply not borne out by the documents that are attached to the complaint. And on that basis, the dismissal should be affirmed, Your Honors. Thank you.
judges: Pregerson, Thompson, Fogel